Hoyt E. Hart II, SBN 125088
**ATTORNEY AT LAW**
P.O. Box 675670
Rancho Santa Fe, CA 92067
858-756-1836
hoyth@prdigy.net

**FILED**

May 18 2026

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY s/ DDE DEPUTY

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. MICHAEL DEUSCHEL, Plaintiff-Relator, | Case No. '26CV3100 WQHGC |
| vs. | |
| CALIFORNIA GOVENOR GAVIN NEWSOM; CALIFORNIA HEALTH AND HUMAN SERVICES AGENCY SERVICES AGENCY, KIM JOHNSON AS SECRETARY; CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, MICHELLE BAASS, AS DIRECTOR; CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, JENNIFER TROIA, AS DIRECTOR; LOS ANGELES COUNTY DEPARTMENT OF SOCIAL SERVICES, JACKIE CONTRERAS, MD, AS DIRECTOR; MONO COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT, KATHRYN PETERSON, MPH, AS AS DIRECTOR; MARTHA SANTANA-CHIN AS CHIEF EXECUTIVE OFFICER OFFICER AND SAMEER AMIN, MD, AS AS CHIEF MEDICAL OFFICER OF L.A. | QUI TAM COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIM, ACT; VIOLATION OF THE MEANINGFUL USE ACT; AND DAMAGES<br><br>FILED IN CAMERA AND PURSUANT TO 31 U.S.C. §3730(b)(2)<br><br>JURY TRIAL DEMANDED<br><br>**DOCUMENTS TO BE PLACED UNDER SEAL (DO NOT PLACE ON PACER)** |

CARE HEALTH PLAN, YOLANDA R. RICHARDSON AS CHIEF EXECUTIVE OFFICER AND STEVE O'BRIEN, MD, AS CHIEF MEDICAL OFFICER OF S.F. HEALTH PLAN; KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, THE PERMANENTE MEDICAL GROUP; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA INCLUDING UCLA, UCI, UCSD, UCD, UCSF MEDICAL CENTERS, ANDREW VIVAS, M.D., ELIZABETH LORDE, M.D., SHARON HAME, M.D., ISAAC YANG, M.D., LEE TAN, M.D.; KEE D. KIM, MD, HAI V LE, MD, RICHARD LEE PRICE, MD; UCD RADIOLOGY AND EMERGENCY DEPARTMENTS AND STAFF; CEDARS-SINAI MEDICAL CENTER, THOMAS M. PRISELAC, CAROL DOBASHI; STANDFORD HEALTH CARE, CORRINA ZYGOURAKIS, M.D., SOPHIA LOO, CHRISTINE BULNES; UNIVERSITY OF SOUTHERN CALIFORNIA KECK HOSPITAL, THOMAS CHEN, M.D.; SUTTER HEALTH, GEORGE PICETTI, M.D., RUDOLPH SCHROT, M.D.; DIGNITY HEALTH SAINT BERNARDINE MEDICAL CENTER; LOS ANGELES COUNTY/USC HOSPITAL; HARBOR-UCLA MEDICAL CENTER; ACHIEVE BRAIN AND SPINE, DANIEL NAGASAWA, MD; RANCHO LOS AMIGOS NATIONAL REHABILITATION CENTER; TENET HEALTH, BEN HENDRICKS, MD; MARINHEALTH, BRIAN SU, MD; NORTHBAY MEDICAL CENTER, PATRICK MALONEY, MD; )

CALIFORNIA PACIFIC MEDICAL CENTER, HESHAM M. ZAKAROI, MD; BARTON HEALTH, ZACHARY CHILD, MD; MERCY HOSPITAL, SACRAMENTO, JESSE BABBITZ, MD; STANFORD HEALTHCARE, JOHN KLEIMEYER, MD; RENOWN REGIONAL MEDICAL CENTER, KATHIKRAM RAGHURAM, MD; BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER HEALTHCARE LLC, BAYER AKTIENGESELLSCHAFT (BAYER AG), and DOES ONE through ONE HUNDRED, inclusive,

Defendants.

# TABLE OF CONTENT:


I. INTRODUCTION .......................................................... 11

II. FALSE CLAIM ACT .......................................................... 14

III. JURISDICTION AND VENUE .......................................... 16

IV. PARTIES:

A. Plaintiff-Relator Michael Deuschel .......................................... 18

B. Defendants .......................................................... 20

1. Public Agency Defendants .......................................... 20

i. California Governor Gavin Newsom .......................... 20

ii. Kim Johnson, Secretary, and the CHHSA .......................... 21

iii. Michelle Baass, Director and the DHCS .......................... 21

iv. Jennifer Troia, Director and the DSS .......................... 22

2. Managed Care Organization Defendants .......................... 22

i. L.A. Care Health Plan .......................................... 22

ii. San Francisco Health Plan .......................................... 23

3. Medical Providers Contracted with Medi-Cal .......................... 23

i. Kaiser Permanente .......................................... 23

ii. UC Regents UCLA Medical Center .......................... 24

iii. UC Regents UCI Medical Center .......................... 24

iv. UC Regents UCSD Medical Center .......................... 24

v. UC Regents UCSF Medical Center .......................... 24

vi. UC Regents UCD Medical Center .......................... 24

vii. Harbor UCLA Medical Center .......................... 25

viii. Cedars-Sinai Medical Center .......................... 25

ix. Stanford Health Care Medical Center .......................... 26

x. Sutter Health .......................................... 26

xi. USC, Keck Medicla Center .......................... 27

xii. LAC+USC Medical Center .......................... 27

xiii. Dignity Health, St. Bernardine Hospital .................. 27
xiv. Achieve Brain and Spine, Daniel Nagasawa, MD ....... 28
xv. Rancho Los Amigos National Rehabilitation Center ..... 28
xvi. Tenant Healthcare Corporation .............................. 28
xvii. MarinHealth Medical Center ................................ 28
xviii. NorthBay Health Medical Center ........................ 29
xix. California Pacific Medical Center (CPMC) .............. 29
xx. Barton Health and the Barton Center for Orthopedics & Wellness .................................................... 29
xxi. Mercy General Hospital, Sacramento ..................... 29
(iv.) Stanford Healthcare Medical Center ...................... 30
(v.) The Regents of the UC and UC Davis ...................... 30
xxii. Renown Medical Center, Reno, NV ...................... 30
xxiii. Bayer HealthCare Pharmaceuticals, Inc. ................ 30
4. DOES ................................................................ 30
5. DEFENDANTS SEPARATE AND JOINT LIABILITY ......... 31
V. THE FEDERAL AND CALIFORNIA'S CONTINUING VIOLATION DOCTRINES APPLIES HEREIN ........................................... 31
VI. CALIFORNIA'S DELAYED DISCOVERY APPLIES HEREIN ......... 32
VII. FACTS COMMON TO ALL CAUSES OF ACTION ....................... 33
A. This Action and Allegations ......................................... 33
1. Introduction to This Action ........................................ 33
2. Defendants Certified Compliance with Anti-Discrimination Law Yet Discriminated Against Relator ............................ 34
3. Introduction to the Allegations .................................... 36
4. M-C's Payment Scheme Encourages and Conceals Fraud ........ 37
5. Public Agency Defendants Defrauded Relator ..................... 41
6. Managed Care Organizations Defrauded Relator .................. 43

7. Medical Provider Defendants Defrauded Relator ................. 43
8. Defendants Collude to Conceal Their Deprivations and Fraud .. 45
B. Plaintiff-Relator's Unique Vantage Point .............................. 50
1. Relator's Adaptive-Patient Insight ..................................... 50
2. Relator Struggles to Survive Gadolinium Toxicty ................ 51
a. Inciting Fraud by Kaiser Permanente........................ 51
b. Relator Cannot Escape the Gravitational Pull of the Foundational Gadolinium Fraud ............................ 52
c. Bayer's History of Disregard of Human Life ............... 58
3. Oppressed for Nearly Seventeen Years, Relator Finally Has Hope when, in Early 2026, Pres. Trump's Administration Initiates Investigations into Medi-Cal Fraud ..................... 59
a. Relator's History of Procedures and Their Delays ......... 59
b. Relator's 17 Wrongfully Delayed/Denied Surgeries ...... 62
c. Relator's Percentage of Delayed/Denied Procedures ...... 62
d. Relator's Average Length of Wrongful Delays ............ 62
e. Relator's History of Denied Joint Surgeries ............... 63
f. Relator's History of Denied Spine Surgeries ............... 64
C. The ACA, Medi-Cal, and DHCS ........................................... 68
1. The Affordable Care Act Requires each State to Have a Medicaid Program ..................................................... 68
a. Medi-Cal is Run by Governor Newsom, CHHSA and DHCS ................................................... 68
b. Key Objectives and Purposes of the M-C Program ........ 71
c. DHCS Powers and Responsibilities ........................... 71
2. DHCS' Dynamics of Bad-Faith and Discrimination ............... 73
a. DHCS' Implement and Escalate "DEAD" Mechanics ..... 73
b. DHCS Failed to Oversee Its Contracted Providers ......... 74

c. DHCS' Policies Dilute M-C Funds and Restrict Access to Care ........................................................ 74
d. The DHCS Effectively "Patient-Dumped" Relator ....... 75
e. DHCS Ignored Relator's Pleas and Allowed Providers to Ignore His Needs .............................................. 75
f. DHCS Obstructed Mammoth Orthopedic Institute's Attempts to Help Relator ........................................ 75
D. The DSS Uses Its Oversight to Obstruction Relator ......................... 76
1. Introduction: DSS Is Missioned to Keep MediCal Fair ........... 76
2. Analysis of DSS State Fair Hearing Jurisdiction .................. 76
3. Federal and State Statutory Authority for State Hearings ......... 77
4. DSS Excluded Relator by Applying a False Jurisdiction ......... 81
5. Recent Sequence of DSS' Judicial Fraud ........................... 82
6. Summary of DSS' Bad Faith and Fraudulent Discrimination ..... 84
E. State and County Public Agencies Violated Relator's State and Federal Constitutional Rights ............................................ 85
1. Public Agencies Deprived Relator of Life, Liberty and Property Interests .................................................. 85
2. Los Angeles and Mono Counties' Social Service Depts. Failed to Perform and Inter-County Transfer ...................... 86
3. State and County Public Agencies Enforced "DEAD" Mechanics ......................................................... 88
a. Public Agencies DEAD Mechanics Inspired Contracted Medical Providers' DOA ...................................... 88
b. Public Agencies' DEAD Restrictions are Lethal ........... 90
c. April 28, 2025 ................................................ 92
d. May 28, 2025 ................................................. 93
4. State and County Public Agencies Silence the Aggrieved ........ 93

F. Public Agency Defendants' False Claims and Discrimination .......... 94

a. Public Agencies' Mechanics of Deprivation ................ 94

b. Public Agencies' Tactics of Deprivation ..................... 95

i. Tactic #1: The Front End ............................. 95

a. Fee-For-Service ................................ 96

b. Capitation Rates for M-C Managed Care .... 97

ii. Tactic #2: The Back End ..............................98

iii. Tactic #3: Daily Systemic Discouragement ........ 101

iv. Tactic #4: Turning a Blind Eye ...................... 102

v. Tactic #5: Concealment ..............................104

G. Internal and External Comparators for M-C's Reimbursement Rates . 105

a. Comparator #1: M-C Access is Substantially Worse Than Counterparts Covered by Other Insurances .......... 105

b. Comparator #2: M-C Access is Substantially Worse Than Other State's Medicaid and Medicare ................ 107

c. Comparator #3: Medical Service Industry Factors Demonstrate Rates Should Have Risen Significantly Over this Period ..........................................109

d. Comparator #4: Prioritization versus Neglect: Defendants Prioritized Log-Term Hospice Care over Physician Medical Services ........................... 111

e. Comparator #5: Public Agencies' Own Records: For forty years, Their Implemented Deprivations Have Had a Harmful Cumulative Effect ...................... 113

H. Summary of Public Agencies' Facts of Fraud ........................... 116

I. Managed Care Organizations' Violations ................................ 117

J. Medical Providers' False Claims ............................................ 119

1. Intro to Medical Providers' Mechanics of Deprivation .......... 119

2. Medical Providers' Tactics of Deprivation ........................ 120
3. Medical Providers' Deprivations—Denied Medical Services ... 120
4. Denied-Outstanding Surgeries ........................................ 121
    1. Denied Surgery for Thoracic Spinal Cord, AWS ......... 121
    2. Denied Surgery: Thoracic Discs and Vertebral Injuries, Perineural Cysts and Impinged Peripheral Nerves ........ 124
    3. Denied Surgery for Revision Cervical Spine Surgery .... 124
    4. Denied Surgery: Lubar Regressive Herniated Disc ....... 128
    5. Denied Surgery: Left Shoulder Injuries ..................... 129
    6. Denied Surgery: Right Shoulder Injury ..................... 129
    7. Denied Surgery: Left Elbow Surgery ......................... 130
    8. Denied Surgery: Right Elbow Surgery ....................... 130
    9. Denied Surgery: Left Wrist ...................................... 130
    10. Deneid Surgery: Right Wrist .................................... 130
    11. Denied Surgery Right Thumb .................................. 131
    12. Denied Surgery: Left Hip Surgery ........................... 131
    13. Denied Surgery: Right Hip Surgery ......................... 131
    14. Denied Surgery: Right Foot Bunion Surgery .............. 132
    15. Denied Surgery: Neurostimulator Replacement .......... 133
    16. Denied Surgery: Oral Surgery .................................. 133
    17. Denied Surgery: Oral Surgery .................................. 133
5. Denied-Outstanding Medical Treatment ............................ 133
    18. Denied Diagnosis & Treatment for GdTox ................. 133
    19. Denied Treatment for Cerebral Atrophy ................... 134
    20. Denied Treatment for Neuro-Ophthalmological Disorders ........................................................ 134
    21. Denied Treatment for Neurological Injuries including Trigeminal and Occipital Neuralgia ........................ 135

22. Denied Treatment for Otolaryngological Disorders ...... 135
23. Denied Treatment for Hearing Loss and Tinnitus ........ 136
24. Denied Treatment for Vocal Cord/Speech Impairment .. 136
25. Denied Treatment for Pituitary Adenoma/Rathke Cyst .. 137
26. Denied Treatment for Osteoporosis ........................ 137
27. Denied Treatment for Pain Management .................. 138
28. Denied Treatment for Left Failed Sacroiliac Fixation ... 138
29. Denied Treatment for Right Failed Sacroiliac Fixation . 138

6. Previous Medical Delays and Denials (D&D) ..................... 138
   1. D&D Surgery Revision Cranioplasty ........................ 138
   2. D&D Surgery: Heart ........................................... 139
   3. D&D Surgery: Right Hand, Thumb ........................... 139

7. Administrative Abuse—Denials—Exclusions ...................... 140
   1. Primary Care Denials and Failures ......................... 140
   2. Denial of Patient Experience Adjudication ................ 141

8. Converging and Escalating Three Forms of Discrimination That Inform Defendants' Deprivations, Fraud and Retaliation . 141

VIII. CAUSE OF ACTION: VIOLATION OF THE FCA ..................... 144
IX. PRAYER FOR RELIEF ........................................................ 145
X. DEMAND FOR JURY TRIAL ................................................ 146

## I. INTRODUCTION:

1. Plaintiff-Relator Michael Deuschel, through his attorney, on behalf of the United States of America (the "Federal Government"), for his Complaint against California's Governor Gavin Newsom and three Public Agencies and their secretary and directors who manage Medi-Cal ("Public Agency Defendants"), two Medi-Cal Managed Care Plans, and sixty-nine contracted Medical Providers and Physicians ("Medical Provider Defendants") alleges based upon personal knowledge, relevant documents, and information and belief, as follows:

2. For twelve years, sixty-nine Medical Providers (1) falsely induce Relator to travel, (2) breach their contract, (3) deny Relator necessary medical services and/or perform pre-operative workups but deny surgeries despite demonstrated necessity; (4) Four Public Agencies knowingly maintain insufficient reimbursement, (5) violate audit/oversight/protection contractual duties, and (6) collude to pay Provider-submitted fraudulent bills despite knowing Providers' deprivations.

3. Defendants participate in fraudulent denial of care and/or profited from submissions of fraudulent bills to Medi-Cal. The Governor and three State Public Agencies fraudulently approve reimbursement while knowing contracted medical providers are denying Relator sixteen necessary surgeries including three spine surgeries, bilateral shoulder, elbow and wrist surgeries, right thumb surgery, bilateral hip surgeries, right foot surgery, neurosurgery and oral surgeries.

4. Defendants collude to (1) breach contract (2) submit false bills; (3) misuse Medi-Cal funds for personal and political gain; (4) conceal the abysmally low reduced reimbursement rates (RRR) that dissuade surgeons from accepting Medi-Cal and fail to adjust, contest or report the RRR; (5) make false records in administrative and/or medical records systems; (6) violate the Affordable Care Act's rules and regulations; (7) avoid and neglect oversight and fail to protect Relator; (8) fail to provide prescribed surgeries to alleviate Relator's exacerbated disabilities;

(9) perform unnecessary surgeries upon Relator to allow medical students to practice upon him while he is anesthetized, then bill for the iatrogenic injuries they inflict upon Relator, and, (10) refuse revision surgery as necessary to correct their iatrogenic injuries; (11) commit elder abuse against Relator; (12) discriminate against Relator, an Adaptive person with disabilities; (13) reduce Relator to 'billing-code-punch-card, or, profit-pod' status as they scheme to extract their ill-gotten gains and defraud the federal government; (14) retaliate, perpetrate and perpetuate these reprehensible acts to silence Relator by incapacitating him, causing him to suffer and slowly die by obstructing access to necessary care and depriving him of life-sustaining surgeries because he complained about their abuse and fraud.

5. Medical Provider Defendants violated Medi-Cal's Meaningful Use Requirement. The Meaningful Use (MU) requirement for Medi-Cal, now often referred to as the Promoting Interoperability Program, means that Medical Providers must use certified Electronic Health Record (EHR) technology in specific, high-quality ways to qualify for incentive payments funded by both federal and state dollars.

6. These incentives are designed to accelerate the adoption of EHRs and improve patient care, with federal funds covering a significant portion of the program costs. Instead, Medical Provider Defendants misused the electronic record system to abuse Relator, deprive him of necessary life-sustaining surgeries and to defraud the federal government. Key Aspects of the Requirement:

i. **Certified Technology:** Providers must use 2015 Edition Certified EHR Technology (CEHRT).

ii. **Demonstrating Use:** Providers must "attest" (declare) that they have met specific objectives, including protecting patient information, e-prescribing, and reporting clinical quality measures.

iii. **Patient Volume Requirements:** To qualify for Medi-Cal payments, providers must have **30% or more** of their patient volume attributable to

Medi-Cal patients (20% for pediatricians) during a 90-day period in the preceding calendar year.

iv. **Funding Structure:** Federal funds (via CMS) provide the majority of the funding, which California uses to incentivize providers to adopt and use these systems.

v. **Penalties:** Failure to demonstrate Meaningful Use can lead to reduced reimbursements.

7. The goal of this initiative is to move away from paper records, improve data sharing among providers, <u>and enhance care coordination</u>. Instead, Medical Providers entered false statements to advance their deprivations by defying their contractual duties, falsely denying the existence of Relator's injuries and defaming Relator to conceal their cruel medical abuse and Medi-Cal fraud.

8. Instead, the clever Defendants counted Relator and by reasonable extrapolation, probably many other Medi-Cal enrolls, to fulfill their 30% Patient Volume requirement when in fact, they fraudulently billed for the preliminary services and "counted" the deprived after they denied the M-C enrollee the expensive, necessary surgeries and treatment.

9. ALL Defendants have harmed Relator, injured his body and destroyed his life by depriving him of necessary medical services. Defendants either fraudulently denied him services without consultation or fraudulently induced Relator to travel to their medical offices located throughout California to receive preliminary medical services with the false promise of performing the necessary surgeries—the goal of the performed preliminary services—while concurrently and repeatedly submitting false bills for the preliminary services though they had no intention of performing the necessary surgeries and indeed denied the medically necessary surgeries due to Medi-Cal's illegally low reduced reimbursement rate (RRR) that the Public Agencies refused to increase.

10. ALL Defendants fraudulently entered into contracts and agreed to fulfill state and federal Medi-Cal rules and regulations while intending to deprive Relator, a FFS Medi-Cal enrollee with a complex. i.e., expensive, medical profile, of necessary medical services due to Medi-Cal's abysmally low reduced reimbursement rates (RRR). Their breach of contractual duties—their medically unethical actions—are the underling acts of fraud that led to their submission of fraudulent billing for presurgical associated services—without provision of the necessary surgeries—which the state readily reimbursed to satiate Medical Provider Defendants and to join them in the State-sponsored Medi-Cal scheme of fraud. Simply, the State Agency Defendants were aware of the deprivation and encouraged it with callous disregard of the pain and injury inflicted upon Relator by the deprivations and contractual and billing fraud.

11. In 2024, State Agency Defendants enforced a new, "Out of County," obstruction that contracted Medical Providers Defendants cited to deny Relator necessary medical services because he resides outside their county, despite the fact that FFS Medi-Cal entitles Relator to self-refer throughout the state of California. This fraudulent policy was a cruel 'death sentence' for many rural Medi-Cal enrollees residing in under-serviced counties. The State thereby enforced an elitist hierarchy of access to care as the University of California medical centers, the ones most ethically and fiscally obligated to service Medi-Cal enrollees because they are financed by state and federal funds, located in urban areas, far from rural, conservative communities. The fraudulent restriction subjects rural community residents to undue hardship and harm. Equally fraudulent, some Defendants demanded cash from Relator for their medical services. When Relator could not pay, they terminated treatment.

**II. False Claim Act (FCA):**

12. The FCA was enacted during the Civil War. Subsequently, Congress found that fraud in federal programs was pervasive. Congress characterized the

FCA as a primary tool for combating government funding fraud and felt it needed modernization. So they amended it in 1986, 2009 and 2010. The 1986 amendment enhanced the government's ability to recover losses sustained because of fraud against the United States. The amendments created incentives for individuals to come forward with information about fraud against the Government without fear of reprisals or Government inaction, and enable the use of private legal resources to prosecute fraud claims on the Government's behalf.

13. The FCA prohibits, inter alia: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly making or using or causing to be made or used, a false or fraudulent record or statement material to a false fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A), (B).

14. Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(A) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. § 2461 note; Public Law 104-410]).

15. Federal statute **31 U.S.C. § 3731(b)** defines the 6 or 10-year statute of limitations for *qui tam* complaints under the False Claims Act (FCA). Under this statute, actions must be brought within six years of the violation, or up to ten years if filed within three years of when the government knew or should have known of the fraud.

16. In 2009, Congress amended the FCA to clarify that a, "claim" includes "any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or sued on the Government's behalf or to advance a Government program or interest …." 31 U.S.C. § 3729(b)(2).

17. In 2019, the United States Supreme Court directly addressed a growing circuit split regarding the statute of limitation issue in the case *Cochise Consultancy, Inc. v. U.S. ex rel. Billy Joe Hunt*, 139 S.Ct. 1507 (2019).

18. The FCA allows any person having information about an FCA violation to bring an action for himself and the Government, and to share in any recovery. The FCA requires the complaint be filed under seal for a minimum of 60 days, without service on the Defendant(s) during that time, to allow the Government time to conduct its own investigation and to determine whether to join the suit.

19. Based on the foregoing laws, qui tam Plaintiff-Relator Michael Deuschel seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which Defendants' misconduct has extended.

## III. JURISDICTION AND VENUE:

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Although the issue is no longer jurisdictional after 2009 amendments to the FCA, to Relator's knowledge there has been no statutorily relevant public disclosure of the allegations or transactions in this Complaint, as those concepts are used in 31 U.S.C. § 3730, as amended by Pub. L. No 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

21. Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based.

22. Before filing this action, Relator voluntarily and repeatedly disclosed to the California Government the information on which the allegations or transactions in the Complaint are based. In 2023, the California Auditor's Office confirmed Relator that he is registered as a Whistle Blower but failed to advance

his complaints of Medi-Cal fraud and the harm he sustained. Additionally, Relator has direct and independent knowledge about the misconduct alleged herein and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to his claims.

23. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, the Defendants can be found in and/or transacts or has transacted business in the State of California.

24. Venue is proper in the State of California pursuant to 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732(a) because the Defendants can be found in and/or transacts or has transacted business in this district, and because violations of 31 U.S.C. §§ 3729 et seq. alleged herein occurred within this district. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this district and/or made significant sales of services within this district.

25. This Court has jurisdiction over the Governmental Code section 11135 and California Code of Regulations, title 2, section 11154(i)(2) claims pursuant to Government Code section 11139; over the request for a Writ of Mandate under Code of Civil Procedure section 1085; and to grant injunctive and declaratory relief under Government Code section 11135, Article VI, Section 10 of the California Constitution, and Code of Civil Procedure sections 410.10, 525, 526, 526a, and 1060, as well as, California's Civil Code section 51, The Unruh Act, and Government Code section 11135, as well as the federal 42 U.S.C. 12101, et seq, and, 42 U.S.C. 12181 et seq, the American with Disabilities Act (ADA).

26. Venue in U.S. Federal Court is appropriate under Code of Civ. Proc. sections 395(a) and 401(a), Defendants are located in or do business in Alameda, Los Angeles, Sacramento, San Diego and San Francisco Counties and the Attorney General has offices throughout California.

## IV. PARTIES:

### A. PLAINTIFF-RELATOR MICHAEL DEUSCHEL:

27. Because Relator is the victim of Defendants' Medi-Cal fraud, and worse, medical abuse and deprivation, his role in this complaint is one of subject/survivor of Defendants' actions and can only be presented from that perspective. His medical dependency upon the Defendants placed him in a vulnerable position and they abused and escalated his desperation by their deprivations.

28. For Relator, two dynamics are central to this complaint: (1) His rare and complex medical profile, and, (2) the endless unjust denials of surgeries create an unprecedented frequency of visits and pleas for Defendants to treat him. His complex, iatrogenic injury damaged ten of his eleven body systems. Consequently, he requires an unusual number of medical services. Worse, the repeated delays and denials of necessary treatment worsened his injuries and requires him to travel throughout California and repeatedly plead for care from Defendants. These two indisputable dynamics, both of which were perpetrated against him, not generated by him, form the central perspective from which he was afforded the unfortunate position to observe and be subject to extensive Medi-Cal Fraud.

29. On June 12, 2009, one contraindicated injection, an iatrogenic injury, rendered Relator an Adaptive person with disabilities due to the iatrogenic injury. He was diagnosed with Nephrogenic Systemic Fibrosis (NSF), a sequela of Gadolinium Toxicity (GdTox). In about 2012, Social Security assessed Relator permanently disabled and enrolled him in Medi-Cal. In about 2016, Social Security recognized NFS as a permanent disability. He is an unhoused resident of California due to his socio-economic collapse caused by Defendants' systemic Medi-Cal fraud and medical deprivations.

30. From about 2012 through 2014, he was mandatorily enrolled in and received his Medi-Cal benefits through the Managed Care Organization (MCO),

L.A. Care. Yet, L.A. Care refused to advocate for and protect him when the contracted medical providers and physicians at Kaiser Permanente denied him multiple prescribed surgeries.

31. About October 2013, the Dept. of Social Service (DSS) Administrative Law Judge ruled in Relator's favor and mandated the shoulder and hip surgeries be performed. Despite the DSS order, L.A. Care and Kaiser refused to perform the surgeries. Relator left L.A. Care in about January 2015. (Relator was entitled to a state hearing as an enrollee in Medi-Cal Managed Care.)

32. In about 2015, Relator moved to San Francisco and was forced to enroll in S.F. Health Plan. UCSF and San Francisco General Hospital refused Relator about eight surgeries. Yet, S.F. Health Plan refused to advocate for Relator and denied him grievance procedures.

33. In about 2016, Plaintiff-Relator transferred to and remains a Medi-Cal "Fee-for-Service," (FFS) Enrollee. FFS Medi-Cal was slated to be terminated on December 31, 2023, at which time Relator would have joined another MCO/Plan but instead two County Social Services refused to change Relator's address to his legal address and Medi-Cal kept Relator in Fee-for-Service category because he was more easily obstructed from receiving prescribed surgeries and care while enrolled in FFS Medi-Cal because the four state agencies deny him case management, ombudsman and hearings.

34. About 2016, Relator returned to Los Angeles to plead for medical services from UCLA, UCI and UCSD. Relator has been repeatedly deprived appropriate, timely medical services including surgeries due to the Public Agency and Medical Provider Defendants' misuse of state and federal funds, as well as intentional and effectuated discrimination against him as a Medi-Cal Enrollee, an Adaptive person with Disabilities and as a Gadolinium Toxicity survivor. Instead, Defendants committed Elder Abuse against Relator and deprived him of necessary, prescribed medical care.

35. About 2023, Relator moved to Mammoth Lakes, California but has yet to receive the necessary, prescribed seventeen surgeries due to Medi-Cal fraud. Since December 2023, Los Angeles County Social Services and Mono County Social Services refused to change his address to his new home address in Mammoth Lakes and thereby obstructed his attempts to enroll in Anthem Blue Cross Managed Care Plan that covers Mono County as his Mammoth Hospital physicians advised. The State Governor and Agency Defendants allowed this to happen because it is easier for them to obstruct Relator's access to care while he is forced to remain enrolled in Fee-for-Service Medi-Cal. This is because, the State Agency Defendants fraudulently denied Relator a case manager, ombudsperson and State Hearings they regularly provide to Managed Care Medi-Cal enrollees.

36. Governor Newsom and the three State Agencies and contracted Medical Providers committed this fraud to conceal their deficient budget that they compromised through mismanagement and illegal expansion.

**B. DEFENDANTS:**

37. It is the long-established rule that in actions challenging the legality of state statutes, regulations, policies, and practices, state officers with statewide administrative functions under the challenged statute are the proper parties defendant. (See, e.g., *Serrano v. Priest* (1976) 18 Cal.3d 728, 752, *supplemented* (1977) 20 Cal.3d 25.)

**1. Public Agency Defendants:**

**i. California Governor Gavin Newsom**

38. The governor's office is the office of final responsibility for overseeing the implementation and operations of Medi-Cal and their new, fraudulent mutation, CalAim. Consequently, Governor Gavin Newsom is personally responsible for allowing ALL Defendants to make false claims, misuse state and federal funds, fail to perform oversight responsibilities and to delay and deny medical services to M-C/C-A Enrollees.

39. Repeatedly, Governor Newsom entered in a corrupt, "Back-Room," deals with Kaiser Permanente that disproportionately reduced its/their responsibilities to assume and treat Medi-Cal Enrollees, shifting the burden to medical providers with less resources and less political influence.

**ii. Kim Johson and the CHHSA:**

40. Defendant Kim Johnson is the Secretary of California's Health and Human Service Agency ("HHSA"). She oversees the Medi-Cal program, including setting of the fee-for-service and capitated managed care Medi-Cal reimbursement rates that this complaint challenges. (Gov. Code §§ 12803, 12850, 12850.4.)

41. As the Secretary of HHSA, she has the power of supervision, and is directly responsible to the Governor, for the operations of HHSA and DHCS. (Gov. Code § 15554.)

42. California Health and Human Service Agency ("HHSA") is the parent entity of the Department of Health Care Services.

**iii. Defendant Michelle Baass and the DHCS:**

43. Defendant Michelle Baass is the Director of California's Department of Health Care Services ("DHCS"). She is responsible for setting Medi-Cal's Fee-For-Service reimbursement rates and managed care capitation rates that this complaint challenges and is responsible for administering the Medi-Cal program, ensuring Medi-Cal patients in FFS and MCOs have proper access to services. (Welf. & Inst. Code § 10721.)

44. California Department of Health Care Services ("DHCS") is charged with administering the Medi-Cal program "in order to secure full compliance with the applicable provisions of state and federal laws." (Welf. & Inst. Code § 10740.)

45. DHCS is responsible for promulgating fee-for-service rates and managed care capitation rates; and for enforcing all Medi-Cal-related statutes and regulations. (Fee-for-service and managed care are the two primary payment modalities for Medi-Cal.)

**iv. Defendant Jennifer Troia and the DSS:**

46. Defendant Jennifer Troia is the Director of the Department of Social Services, ("DSS"). She exercises general supervision over, and is directly responsible to the Governor for, the operations of DSS. (Gov. Code § 15554.)

47. California's Dept. of Social Services (DSS) is a California state agency for many of the social safety net programs and is within the auspices of the California Health and Human Services Agency. It provides oversight of Medi-Cal and state hearings for aggrieved Medi-Cal Enrollees.

**2. Managed Care Organization Defendants:**

**i. L.A. Care Health Plan:**

48. Established in 1997, the local initiative Health Authority for Los Angeles County—L.A. Care Health Plan—is a public agency that manages Medi-Cal Enrollees. It is governed by a 13-member stakeholder Board of Governors. It is the nation's largest publicly operated not-for-profit health plan that claims to spend 95% of its revenue on patient care. In March 2022 LA Care was fined $55 million by the California Department of Managed Health Care and Department of Health Care Services for "Deep-rooted, systemic failures that threaten the health and safety of its members. In March 2023, the Los Angeles Times reported that, according to hospitals in the region, the problems persisted and had reached a "Crisis point." [Reyes-Alpert, Emily (2023-03-26). "Hospitals complain problems persist a year after L.A. Care was hit with record fines". *Los Angeles Times*. Retrieved 2023-09-13.] In September 2023, L.A. Care agreed to a $1.3 million settlement to resolve two HIPPA violations. John Baackes is the Chief Executive Officer (CEO) and Sameer Amin, MD, is the Chief Medical Officer (CMO) of L.A. Care Health Plan. Dr. Amin is responsible for developing and implementing strategies for the delivery of health care for the Medi-Cal Enrollees.

49.

### ii. San Francisco Health Plan:

50. In 1994, San Francisco City and County created San Francisco Health Authority (SFHA) under authority granted by the Welfare and Institutions Code Section 14087.36 and in 1997 received a Knox-Keene Health Care Plan license in 1996. In 1997, California entered into a contract with SFHA to provide managed care services to Medi-Cal Enrollees as the local initiative under the name, San Francisco Health Plan (SFHP) serving about 132,000 Medi-Cal Enrollees. SFHP is a public, not-for-profit, NCQA Accredited Medicaid HMO Health Plan. Yolanda R. Richardson (Previously it was John F Grgurina, Jr.) is the Chief Executive Officer (CEO) and Eddy Ang, MD, is the Chief Medical Officer (CMO) of SFHP. Dr. Ang is responsible for developing and implementing strategies for the delivery of health care for the Medi-Cal Enrollees.

## 3. MEDICAL PROVIDER DEFENDANTS:

### i. Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, the Kaiser Permanente Medical Group:

51. June 12, 2009, Kaiser Permanente Radiologist administered the contraindicated injection of Gadolinium-based contrast agent (GBCA), Magnevist, manufactured by Bayer Pharma in preparation of an MRI, without proper advisement or testing and injured Relator. Kaiser then lied about its use of the GBCA Magnevist and instead fraudulently claimed they used an iodine-based dye.

52. Linear GBCA's coating was not protective. It quickly deteriorated within six to eight hours. In Relator's case, the toxin was trapped in his body for at least 72 hours. Worse, thanks to the courage of one surgeon, Relator learned it remains in his body to this day. In 2023, Timothy Crall, MD, of Mammoth Lakes Hospital, did what no other physician would do and performed a pelvic biopsy and had the bone analyzed. Fourteen years after the toxic injection, Gadolinium remained in Relator's body.

53. That which is born of fraud will forever suffocate under its oppression until righted. The abuse of medical protocol when diagnosing Relator and reporting the deceits, denials and denegration is a derangement that continues to this day.

54. 2009 through 2014, Relator endured Kaiser Permanente's False Claims and violations of the Meaningful Use requirement. He repeatedly suffered their aggressive ability-based discrimination and denial of appropriate and timely medical services including testing for Gadolinium Toxicity and surgeries.

55. Once enrolled in Medi-Cal and after he prevailed in the DSS State Hearing, Kaiser escalated their deprivations and denied Relator multiple medical services including shoulder, hip and revision cervical spine surgeries.

56. During Covid-19 pandemic and recently, Kaiser Permanente made corrupt, "Back-Room," deals with Governor Gavin Newsom that disproportionately reduced its/their responsibilities to assume and treat Medi-Cal Enrollees, shifting the burden to medical providers with less resources and less political influence.

57. In October 2023, Kaiser Permanente agreed to pay a $50 million fine under a $200 million settlement as per the California Department of Managed Health Care—the highest fine the state's managed health care agency has ever levied, as per DMHC Director Mary Watanabe.

**ii. UC Regents UCLA Medical Center,**

**iii. UC Regents UCI Medical Center,**

**iv. UC Regents UCSD Medical Center,**

**v. UC Regents UCSF Medical Center,**

**vi. UC Regents UCD Medical Center:**

58. The Regents is a governing Board of the University of California, a state university system in California. The Board of Regents has 26 voting members, the majority of whom are appointed by the Governor to serve 12-year terms. They control the University of California Medical Centers, which contract with Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds.

59. Defendants UC Regents Medical Centers are and at all times relevant were public entities and corporations duly organized and existing under and by virtue of the laws of the State of California, with their headquarters in the Oakland, Alameda County.

60. It/they are professional medical corporation(s) engaged in the business of providing medical services. Individually and collectively, they are some of the largest medical providers in California. Andrew Vivas, M.D., Elizabeth Lorde, M.D., Sharon Hame, M.D., Isaac Yang, M.D Lee Tan, M.D., are physicians employed by the UC Regents who wrongfully discriminated against Relator and denied him timely medical services including surgeries.

**vii. Harbor UCLA Medical Center:**

61. Defendant Harbor UCLA Medical Center is one of Los Angeles' "County Hospitals," and was at all times relevant, a public entity and corporation duly organized and existing under and by virtue of the laws of the State of California. Harbor UCLA refused to perform any surgeries for Relator despite his well-documented need for brain, spine and orthopedic joint surgeries, etc., and despite his submitted grievances.

**viii. Cedars-Sinai Medical Center:**

62. Defendant Cedars-Sinai Medical Center is and was at all times relevant, a public entity and corporation duly organized and existing under and by virtue of the laws of the State of California. Cedars Sinai Medical Center is a nonprofit tertiary 886-bed hospital and multispecialty academic health science center located in Los Angeles, California. Cedars-Sinai subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds. Mr. Thomas M. Priselac is its CEO. Carol Dobashi is the clinic manager for the Orthopedic Department, Anca M. Barbu, M.D., Keith L. Black, M.D., Robert C. Klapper, M.D., Frantz R. Lerebours, M.D., Carol A Lin, M.D., Mark S. Vrahas, M.D., are physicians associated or contracted with or employed by Cedars-Sinai.

### ix. Stanford Health Care:

63. Defendant Stanford Health Care is Stanford University's Medical Center and is and at all times relevant was, a public entity and corporation duly organized and existing under and by virtue of the laws of the State of California. Stanford University is a private research university located in the census-designated place of Stanford, California.

64. Stanford Health Care is a medical complex which includes Stanford Health Care and Stanford Children's Health. It is consistently ranked as one of the best hospitals in the United States and serves as a teaching hospital for the Stanford University School of Medicine. In 2020–21, it was ranked by the US News as the 4th-best hospital in California (behind ULCA, Cedars Sinai and UCSF, respectively) and 13th-best in the country. Stanford Health Care subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds.

65. Corrina Zygourakis, M.D. is a physician employed by Stanford Health.

### x. Sutter Health:

66. Defendant Sutter Health is and was at all times relevant, a public entity and corporation duly organized and existing under and by virtue of the laws of the State of California. Sutter Health, founded in 1921 as a response to the 1918 flu pandemic, is a not-for-profit health delivery system headquartered in Sacramento. It operates 24 acute care hospitals and over 200 clinics in Northern California. Sutter Health subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds. George Picetti, M.D. and Rudolph Schrot, M.D., are physicians employed by Sutter Health.

///

///

**xi. University of Southern California, Keck Medical Center**

67. Defendants University of Southern California (USC) Keck Medical Center is and was at all times relevant a private research university in Los Angeles, California.

68. The Keck Hospital of USC is a private 401–licensed bed teaching hospital of the University of Southern California (USC). The hospital is part of the USC Keck School of Medicine, it is located on the USC Health Sciences Campus, which is adjacent to the Los Angeles County+USC Medical Center, east of downtown Los Angeles.

69. In 2019, the Keck Hospital was ranked by U.S. News & World Report as the fifth on the West Coast after the UCLA Ronald Reagan Medical Center, Cedars-Sinai Medical Center, UCSF Medical Center, and Stanford University Medical Center. Keck Hospital of USC subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds. Thomas Chen, M.D. is a physician employed by USC Keck Medical Center.

**xii. LAC+USC Medical Center:**

70. Defendant LAC+USC Medical Center is one of Los Angeles' "County Hospitals," and was at all times relevant, a public entity and corporation duly organized and existing under and by virtue of the laws of the State of California. LAC+USC refused to perform any surgeries for Relator despite his well-documented need for brain, spine and orthopedic joint surgeries, etc., and despite his submitted grievances.

**xiii. Dignity Health Saint Bernardine Hospital:**

71. Saint Bernardine Medical Center in San Bernardino, California, is a general medicine and surgical facility. It is a member of the Dignity Health Medical Foundation. Dignity Health is a Catholic-based not-for-profit public-benefit corporation that operates hospitals in three states. It is the fifth largest hospital

system in the nation and the largest not-for-profit hospital provider in California. In February 2019, Dignity Health merged with Catholic Health Initiatives, becoming Common Spirit Health. It is headquartered in San Francisco, CA. Saint Bernardine subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds.

**xiv. Achieve Brain and Spine:**

72. Achieve Brain and Spine is a private medical group located at 2811 Wilshire Blvd., Ste 93, Santa Monica, CA 90403. Orthopedic and Neurosurgeons treat patients with brain and spine disorders and injuries. They are contracted with Medi-Cal. Daniel Nagasawa, MD, is a neurosurgeon employed by Achieve Brain and Spine and co-owner of Achieve Brain and Spine.

**xv. Rancho Los Amigos National Rehabilitation Center:**

73. Rancho Los Amigos National Rehabilitation Center located at 7601 Imperial Hwy., Downey, CA 90242 and part of Los Angeles County Dept. of Health Services. In March 2024. It is famous for treating spinal cord injuries and one of the largest U.S. rehabilitation hospitals.

**xvi. Tenant Healthcare Corporation:**

74. Tenant Healthcare Corporation is a for-profit healthcare service headquartered in Dallas, Texas, and located at 35 and 77 Casa St., San Luis Obispo, CA 93405. It was recently purchased by the non-profit organization, Adventist Health. Adventist settled a False Claim suit for $112 million dollars in September 2015. Adventist Health is a Seventh-Day Adventist faith-based, nonprofit integrated healthcare system serving communities on the west coast and Hawaii. Its mission is to, “Live God’s love by inspiring health, wholeness and hope.”

75. Ben Hendricks, MD, is a surgeon employed by Tenant Health.

**xvii. MarinHealth Medical Center:**

76. MarinHealth Medical Center located at 250 Bon Air Rd., Greenbrae, CA 94904, is a 327-bed independent acute care, Level III trauma center hospital established in 1952 and affiliated with UCSF Medical Center. Its Spine Clinic is

located at 2 Bon Air Road, Ste 120, Larkspur, CA 94939. Brian Su, MD, is a surgeon employed by MarinHealth.

**xviii. NorthBay Health Medical Center:**

77. NorthBay Health Medical Center located at 1200 B Gale Wilson Blvd., Fairfield, CA 94533 is a nonprofit 154-bed acute-care Level II Trauma Center hospital and part of the community-based NorthBay Health System. Neurosurgery is located at 1860 Pennsylvania Ave., Ste 230, Fairfield, CA 94533. Patrick Maloney, MD, is a surgeon employed by NorthBay Health.

**xix. California Pacific Medical Center:**

78. California Pacific Medical Center (CPMC) located at 1101 Van Ness Ave, San Francisco, CA 94109, is a large, private, not-for-profit academic medical center in San Francisco. It is affiliated with Sutter Health, a large not-for-profit health system. Sutter Health agreed to pay $228.5 million settlement to settle a class action antitrust settlement in April 2025. Hesham M Zakaroia, MD is a surgeon employed by CPMC.

**xx. Barton Health and Barton Center for Orthopedics:**

79. Barton Health and the Barton Center for Orthopedics & Wellness located at 2170B South Ave, South Lake Tahoe, CA 96150 is a nonprofit community health system. Zachary Child, MD, is a surgeon employed by Barton Health.

**xxi. Mercy General Hospital:**

80. Mercy General Hospital, located at 4001 J St., Sacramento, CA 95816, is a 342-bed nonprofit, private community-based hospital. It is owned and operated by CommonSpirit Health through its subsidiary, Dignity Health; Dignity Health is a multi-state non-profit health network. Jesse Babbitz, MD, is a surgeon employed by Mercy General Hospital.

**(iv. cont.) Stanford Healthcare Medical Center:**

81. Stanford Healthcare Medical Center Hospital is a private teaching hospital. It is located at 300 Pasteur Drive, Palo Alto, CA 94305. It is a 368 private

patient room and 28 operating rooms and a Level I Trauma Center. Stanford also operates a separate 311-bed Lucile Pachard Children's Hospital. Neurosurgery is located at 213 Quarry Road, Palo Alto, CA 94304-5979. John Kleimeyer, MD, is a surgeon employed by Stanford.

**(v. cont.) UC Davis Medical Center:**

82. UC Davis Medicla Center, a public teaching medical center located at 4301 X St., Sacramento, CA 95817, is owned and operated by the Regents of the University of California. The Spine Center is located at 3301 C St., #1500, Sacramento, CA 95816. Hai V. Le, MD, and Kee D. Kim, MD are surgeons employed by UC Davis.

**xxii. Renown Regional Medical Center, Reno, NV:**

83. Renown Regional Medical Center is part of Renown Health. It is a non-profit 650 bed, level II trauma center located at 1155 Mill St., Reno, NV.

**xxiii. Bayer Healthcare Pharmaceuticals, Inc., Bayer Healthcare LLC, Bayer Aktiengesellschaft/Bayer AG:**

84. Bayer AG is a German multinational pharmaceutical/biotechnology company and is one of the largest pharmaceutical/biomedical companies in the world. It is headquartered in Leverkusen. In 1988, Bayer obtained FDA approval to market Magnevist, its Gadolinium-based contrast agent, in the United States. In June 2009, Magnevist poisoned Relator and extensively damaged his body.

**4. Does:**

85. The true names and capacities, where individual, corporate, associate or otherwise, of defendants named herein as Does 1 through 100, inclusive, are unknown to Relator, who therefore sues said Defendants by such fictitious names. Each of the defendants named herein as a Doe is responsible in some manner for the events and happenings hereinafter referred to, and some of Relator's damages as herein alleged were proximately caused by such Defendants. Relator will seek

leave to amend this complaint to show said Defendants' true names and capacities when the same have been ascertained.

### 5. DEFENDANTS' SEPARATE AND JOINT LIABILITY:

86. At all times mentioned herein, each of the Defendants was the agent or employee or each other Defendants, or an independent contractor, or joint venturer, and in doing the things herein alleged, each such defendant was acting within the scope of said agency and/or employment and with the permission and consent of each other Defendant.

87. Relator alleges that there exists, and at all times mentioned existed, a unity of interest between Medical Provider Defendants, Managed Care Plan Defendants and State Agency Defendants and Bayer Pharma and each of them are and at all times herein mentioned were, mutual instruments and conduit through which Defendants, and all of them, carried on their fraudulent injurious business in the State of California.

88. Adherence to the fiction of the separate existence of the Defendants and all of them, would permit an abuse of the corporate privilege and publicly formed county charters authorizing defendants' existence and would promote injustice by protecting Defendants from prosecution for the wrongful acts committed by them under their individual names.

89. Furthermore, Relator is informed and believes that Defendants in a joint venture to provide the services that are the subject of this lawsuit, were so intimately intertwined that the Medi-Cal policies and practices that were utilized that are the subject of this lawsuit were equally those of all Defendants.

## V. THE FEDERAL AND CALIFORNIA'S CONTINUING VIOLATIONS DOCTRINE (REPEATED VIOLATIONS) APPLIES HEREIN:

90. According to the Federal Repeated Violations Doctrine, a qualified individual suffers new discrimination and a new injury each day he cannot utilize a noncompliant service, program, or activity even where the barriers giving rise to the

claim are ones encountered before the latest injury. A qualified individual with a disability is still excluded from utilizing any service, program, or activity of a public entity each day it remains noncompliant. The U.S. Supreme Court has recognized that failure to accommodate persons with disabilities often has the same practical effect as outright exclusion, and therefore, title II imposes an affirmative obligation on a public entity to accommodate persons with disabilities.

91. The California Continuity Doctrine allows a series of discrimiantion actions and inactions or a pattern of conduct to be treated as a single, ongoing violation, potentially extending the statute of limitations for filing this complaint. "A violation within the statute of limitations period may "revive" an earlier violation of the same type that occurred outside the limitations period. The clock for filing a discrimination claim does not start running until after the last instance of the discriminatory behavior occurs, especially in cases of ongoing harassment and exclusion.

92. The duty to accommodate contained both in title II of the ADA and in §504 of the Rehabilitation Act clearly and unambiguously convey those noncompliant services, programs, or activities, give rise to repeated violations. Failing to act in the face of an affirmative duty creates the liability. Also, that means if the entity under the affirmative duty to act fails to act while the underlying problem remains not fixed, then every day's inaction amounts to a new violation.

## VI. CALIFORNIA'S DELAYED DISCOVERY APPLIES HEREIN:

93. California's Delayed Discovery Rule is a common law doctrine developed by courts (e.g., *Norgart v. Upjohn Co.*) and incorporated into specific statutes of limitations, such as CCP §340.5 (medical malpractice) and CCP §340.1 (sexual abuse) and CACI instructions to the jury, no. 455, Statute of Limitations and Delayed Discovery. It pauses the deadline for filing a lawsuit until a plaintiff knows, or reasonably should know, they have been injured and know the cause of that injury.

## VII. FACTS COMMON TO ALL CAUSES OF ACTION:

### a. This Action and Allegations

#### 1. Introduction to this Action:

94. This is an action to recover damages and civil penalties on behalf of the United States of America and Plaintiff-Relator ("Relator") arising from false or fraudulent claims, records, and statements made and caused to be made by ALL Defendants and/or their agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq ("the FCA").

95. This action seeks to assist in the recovery of federal dollars spent to fund, implement, and manage California's Medicaid program, known as, "Medi-Cal," as well as its latest permutation, "CalAIM," (M-C/C-A) and its electronic administrative and health records by ALL Defendants, all managed in an illegal and fraudulent manner.

96. Since 2011, the Federal Government has spent billions of dollars in stimulus and operational funding under Medicaid, and subsequently, the Affordable Care Act, as well as other federal funding, to implement and advance the meaningful use of M-C/C-A so that citizens who could not afford 'private' health care could be 'covered,' and receive appropriate and timely medical services under M-C/C-A.

97. The Federal Government oversees and provides California's Public Agency Defendants substantial funding to finance M-C/C-A programs, who, in turn, oversee the use of funds they provide to MCOs and contracted Medical Provider Defendants.

98. Public Agency Defendants provide grants to the Medical Centers and MCO/Plans that contract with Medi-Cal, and, "Reimbursements," to physicians who provide medical service to M-C/C-A Enrollees. The Medical Provider Defendants are some of the most prominent medical providers in California, often serving as "Teaching Institutions," for medical students.

**2. Defendants Certified Compliance with Anti-Discrimination Laws Yet Discriminated Against Relator:**

99. All Defendants intentionally and effectually discriminate against Relator due to his disabilities, medical condition and Medi-Cal (M-C) enrollment and when he objected, they retaliated.

100. Yet, Public Agency Defendants must comply with federal civil rights laws that prohibit discrimination against enrollees based on disability, medical condition or Medi-Cal enrollment. States must submit a State Plan that complies with 42 CFR Part 431 which adheres to Title II of the American with Disabilities Act (ADA), section 504 of the Rehabilitation Act and Section 1557 of the Affordable Care Act. They cannot impose eligibility requirements that result in illegal, arbitrary or discriminatory treatment of individuals.

101. The Attorney General and DHCS have repeatedly discriminated against Relator, ignored his complaints of discrimination and fraud and used their offices and laws to retaliate against him for his oral and written complaints to the Public Agencies and Office of Civil Rights (OCR) and for his court-filed complaints, thereby enabling and concealing the Public Agencies and Medical Provider Defendants' twelve years of discrimination and further harm Relator.

102. Likewise, Medical Providers contracted with Medi-Cal must certify compliance with federal civil rights laws, including prohibition of discrimination based on disability, medical condition or M-C enrollment. This includes adherence to regulations under the Rehabilitation Act and Affordable Care Act (ACA) Section 1557, which prohibits treating enrollees differently due to disabilities.

103. The National Health Law Program requires Medi-Cal Managed Care Organizations (MCOs) and PHP's contracts to specifically prohibit discrimination based on disabilities, medical condition and M-C enrollment. Even the California Office of Attorney General notes section 1157 of the Affordable Care Acts prohibits any program receiving federal funds from discrimination based on disability. The

Department of Health Care Services confirms that state plans require a signed certification by the state Attorney General, ensuring that the Agency will act in accordance with federal requirements. Yet, they themselves discriminate.

104. Also, pharmaceutical companies like Defendant Bayer Pharma, that accept federal funds, including Medicare Part B and Medicaid payments, are considered recipients of federal assistance and must comply with federal civil rights laws that prohibit discrimination based on disability or medical condition. They must adhere to regulations that trigger civil rights compliance. As Medicare Part B payments are considered federal financial assistance, recipients are liable for violations of Section 504 of the Rehabilitation Act of 1973. They are prohibited from discriminating on the basis of race, color, national origin, sex, age or disability.

105. Likewise, Pharmaceutical manufacturers participating in the 304B Program, which provides reduced rates to specific health care organization, must comply with federal requirements, which includes non-discrimination, as part of their participation, often enforced through 42 CFR Part 431, Subpart E (fair hearing rights). Also, pharmaceutical companies that receive funding from the Department of Health and Human Services (HHS), which includes Medicare and Medicaid reimbursement, are considered "covered entities" under Section 1557 of the Affordable Care Act (ACA). This applies to any manufacturer that receive direct reimbursement or grants from the HHS.

106. 42 CFR Part 431 and Part 438 Compliance apply to such manufacturers. 45 CFR Part 92, Nondiscrimination in Health programs, implements section 1557 of the Patient Protection and Affordable Care Act (ACA) (42 U.S.C. 18116) including if they operate as a contractor within the Medicaid managed care plan. In 2024, new HHS rules that took effect in July 2024 clarified that Medicare Part B payments constitute federal financial assistance. Covered entities cannot exclude or restrict access to services nor discriminate against individuals with disabilities in any way.

**3. Introduction to the Allegations:**

107. ALL Defendants violate their M-C contractual duties to treat Relator but falsely claim they fulfill them in order to receive the base pay and supplemental grants and thereby commit their first act of fraud. In their second act of fraud, Defendants induce Relator to travel to their medical offices and undergo pre-operative evaluations, imaging and testing that demonstrate the necessity of the surgeries and treatment but deprive him of them while accepting the M-C funds and concealing their deprivation. In their third act of fraud, Defendants "Count" Relator as a treated M-C enrollee toward their quota for qualification of funds but refuse him surgeries and treatment. In their fourth act of fraud, Defendants make false entries into their electronic medical records—violations of the Meaningful Use Act. In their fifth act of fraud, Defendants discriminate against Relator for his M-C enrollment, disability status, and medical conditions but they contractually agreed not to do so, falsely report they do not do so but indeed do discriminate against and abuse him. Defendants' individual five acts of fraud and their aggregate impact harm Relator as well as the state and nation's citizenry, their economies and the federal government.

108. For decades, ALL Defendants entered into M-C/C-A contracts knowing its abysmally low reduced reimbursement rate (RRR) was insufficient to induce physicians to perform surgeries at a financial loss. Hence, some of the medical centers allow their physicians to contractually, "opt out," of serving M-C enrollees; they indeed denied Relator based on this fact. Worse, Medical Provider Defendants manipulate medical practices and protocols in order to deprive Relator. Then, Medical Centers' Grievance Depts., and, the Public Agency Defendants and Managed Care Plan Defendants simply ignore the aggrieved M-C Enrollee.

109. Public Agency Defendants set abysmally low reduced reimbursement rates and neglected their oversight responsibilities. They thereby effectually discriminated against Relator as a Medi-Cal enrollee, an Adaptive person with

disabilities, and a survivor of Gadolinium Toxicity. They denied him the services he was entitled to receive as an M-C enrollee including appropriate, timely administrative advocacy and remedy services to resolve unwarranted deprivations by contracted Managed Care Plans and Medical Provider Defendants.

110. Medical Providers Defendants such as UCLA and Cedars Sinai accepted Medi-Cal Funds/Grants and advertised that they accept Medi-Cal but allow(ed) their physicians to "Opt-Out," of Medi-Cal while they remain affiliated with and conduct business under the Medical Center's name and at its facility, enjoying the perks without assuming the responsibility of providing care to the state's poor. Currently more than 13 million citizens, about one-third of the state's population, are enrolled in Medi-Cal. When Relator filed complaints against the offending parties, they retaliated, further excluded him from services and even physically assaulted and slandered him.

111. Public Agency and Managed Care Organization Defendants turned a blind eye while Medical Provider Defendants continue to accept Grants but select which M-C enrollees to treat and which to discriminatorily deny—typically the severely ill in need of expensive surgeries and treatments, like Relator. In exchange, Medical Provider Defendants remain silent and turn a blind eye to the Public Agency's diversion and misuse of state and federal funds.

112. ALL Defendants obstruct Relator from utilizing the available grievance procedures. Instead, they force him to suffer in pain without services, knowing he could die. They thereby discriminate against him based upon his M-C enrollment status, disability status and medical condition status. For about twelve years, ALL Defendants exercised the trifecta of discrimination without reproach.

4. **M-C's "Complex" Base and Supplemental Payment Scheme Encourages and Conceals Fraud:**

113. According to the DHCS, Medi-Cal payments to hospitals include both base (reimbursement for medical services) and supplemental payments.

Supplemental payments are separate from and in addition to the base payments for services rendered to Medi-Cal beneficiaries. Supplemental payment programs utilize federally finances to increase reimbursements to hospitals. Relator alleges the mechanisms the state employs are not as the federal government intended.

114. The bulk of Medi-Cal payments to hospitals are for inpatient services. Hospitals are reimbursed for inpatient services provided to Medi-Cal members via a combination of base and supplemental payments in both the fee-for-service and managed care delivery systems.

115. In the fee-for-service delivery system, both the base and supplemental payments are developed and proposed by DHCS and must be approved by federal Centers for Medicare and Medicaid Services (CMS). DHCS utilizes the full federal Upper Payment Limit (UPL), which limits Medi-Cal reimbursement for inpatient facilities to what would have otherwise been reimbursed under Medicare. The state claims their abysmally low reduced reimbursement rates for fee-for-servive enrollees are already at or near the federal UPL and this supposedly limits their ability to raise fee-for-service rates. Relator alleges this is false.

116. In the managed care delivery system, the base payment is typically determined by the negotiated contract between a hospital and MCP. The supplemental payments are developed and proposed by DHCS and supposedly approved by CMS. The total payment amount including base and supplemental payments is subject to a variety of considerations, including a hard cap at the average commercial market rate. Hospitals can seek increases to their base reimbursement through negotiations with MCPs, while DHCS works with CMS to seek approval of appropriate increases to supplemental payments. (attachment-hospital-financing-explainer-march-2024.pdf) Relator alleges the State Public Agencies have deceived he federal government on this and all related issues and instead uses the funds for self-enrichment and political agendas.

117. California provides supplemental payments, specialized funding programs, and, in some cases, direct grants to hospitals for participating in Medi-Cal, alongside standard billing reimbursements. These funds are designed to support hospitals serving high numbers of Medi-Cal patients and to build capacity through initiatives like CalAIM. Key funding and grant mechanisms include:

- **Supplemental Payments:** Beyond base payments, hospitals receive supplemental payments (e.g., DSH - Disproportionate Share Hospital) that utilize federally approved financing to increase reimbursement.
- **CalAIM PATH Initiative:** The state awarded $37 million in 2024 to clinics and providers to build capacity for Enhanced Care Management and Community Supports, which are part of the Medi-Cal delivery system.
- **Medi-Cal Capacity Grant Program:** Administered through local Medi-Cal Managed Care Plans (e.g., Central California Alliance for Health) to improve access and provider capacity.
- **Hospital Financing Mechanisms:** Programs like the Physician Non-Physician Practitioner Supplemental Reimbursement Program (PNPP) provide extra funding for services at government-operated hospitals.
- **Direct Grants for Specific Initiatives:** Managed care plans offer grants (up to $100,000 per applicant) to help providers enroll and retain eligible members in Medi-Cal.

118. These payments are intended for hospitals that take on the burden of serving high numbers of Medi-Cal patients, helping to sustain their operational viability. Relator alleges the recipients are not serving him and by reasonable extrapolation, many other M-C enrollees.

119. In recent years, DHCS, in partnership with hospitals, has made a concerted effort to increase hospital supplemental payments in the managed care delivery system. In the last three years (as of calendar year 2024, subject to CMS approval), DHCS

increased the annual amount of self-financed hospital supplemental payments in managed care by:

- Approximately $3.2 billion (annualized) for private hospitals.
- Approximately $900 million (annualized) for designated public hospitals.
- Approximately $225 million (annualized) for district and municipal public hospitals.

120. A portion of these increases offset decreases to fee-for-service supplemental payments; and, as previously noted, the net benefit of these increases to hospitals is less than the total amount of the increases due to the nuance of self-financing.

121. On **July 22, 2024**, DHCS awarded $37 million to 49 clinics providing Enhanced Care Management and Community Supports services to Medi-Cal members. Awards are being made as part of the PATH CITED initiative's work to help build, maintain, and scale clinics' capacity to participate in the Medi-Cal delivery system. (CalAIM-PATH)

122. On **August 30, 2024**, DHCS awarded $146.6 million to 133 organizations providing Enhanced Care Management (ECM) and Community Supports services to Medi-Cal members. Awards are being made as part of the Providing Access and Transforming Health (PATH) Capacity and Infrastructure, Transition, Expansion, and Development (CITED) initiative's work to help build, maintain, and scale providers' capacity to participate in the Medi-Cal delivery system and **serve the whole person**.

123. In total across the fee-for-service and managed care delivery systems, DHCS makes approximately $13–15 billion in net-benefit supplemental payments to hospitals each year in addition to their base payments. (attachment-hospital-financing-explainer-march-2024.pdf)

124. Yet, Relator has not been holistically treated but denied 17 surgeries and 12 treatments. The secretive and complex base and supplemental system of payment create an incentive to commit fraud. It encourages Medical Providers to "count" a M-C enrollee as "serviced" by providing elementary pre-operative services for "headcount" purposes

to qualify for the supplemental grants but to subsequently deny the expensive, medically necessary surgeries. This is an act of fraud, not to mention unethical.

125. The supplemental grants demonstrate there exists an abundance of funds to pay for surgeries Relator requires but given the Public Agencies and contracted Providers' greed and Adaptive Animosity, they relish the opportunity to deprive Relator because he dares to object to their fraud and cruelty.

**5. Public Agencies Defrauded Relator:**

126. They intentionally and effectually defraud Relator when they discriminate against him. As an FFS M-C enrollee, they refuse him the same or equivalent case manager, Ombudsman and State Hearings that they provide to MCO M-C enrollees.

127. Their eligibility criteria for a State Hearing to address the medical deprivations is absurd. They make it dependent upon Medical Providers' submission of a, "Treatment Authorization Request (TAR)," for the denied surgeries. Obviously, physicians and administrators refuse to submit a request for authorization for the surgeries they do not want to perform at a financial loss.

128. TARS are the very administrative forms that the Medical Provider Defendants manipulate in order to deny medical services including surgeries. Therefore, the Public Agency Defendants' establishment of them as prerequisites for Relator to be entitled to a State Hearing is not only absurd but discriminatory and fraudulent as it excludes him, an Adaptive person with disabilities in need of multiple life-sustaining surgeries, from judicial services. The exclusion is orchestrated by the Medical Providers as per the rules written by the Public Agencies. They refuse to revise the discriminatory corruption, despite Relator's repeated complaints.

129. Also, at the end of 2023, the Public Agency Defendants intend to eliminate the FFS category. What was once Medi-Cal's preferred category due to its reduced bureaucratic hinderances and state-wide acceptance, has become a

pariah in the last two years. Public Agency Defendants enacted administrative encumbrances to obstruct access to medical services and actively discourage Medical Provider Defendants from accepting FFS Medi-Cal. Thus, for 2022 to the present, Medical Provider Defendants throughout California comply and refuse to accept Relator's M-C to perform surgeries for his exacerbated disabilities.

130. ALL Defendants' manipulation of benefits and failures to meaningfully use federal funds and electronic records to the benefit of Relator, a beneficiary of Medi-Cal, has had a devastating impact upon him and by reasonable extrapolation, millions of other deceived M-C/C-A Enrollees.

131. Among their fraudulent acts, the Public Agency Defendants:

(1) Underfund and over-enroll Medi-Cal to implausible, unsustainable levels;

(2) Overspend on run-away operational costs as they exceed the industrial standard of Medical Cost Ratio (MCR) of 15% and soar to the noncompliant and subverting level of 50% and greater;[1]

(3) Misuse state and federal funds to advance unauthorized political goals and for self-enrichment, and unlawfully divert funds to political allies;

(4) Fail to perform "Oversight," responsibilities and allowed contracted Medical Providers, Physicians and Managed Care Organizations to deny Relator and millions of other M-C/C-A Enrollees, appropriate and timely medical services including life-sustaining surgeries;

(5) Fail to report financial and medical violations to the government;

(6) Fail to appropriately investigate Relator's complaints;

(7) Fail to provide Relator with Medi-Cal bills despite his request;

(8) Make false claims and allow the federal government to believe that they fulfill their Medi-Cal and Affordable Care Act contractual duties;

---

[1] The conventional term, Medical Loss Ratios (MLR) is a throw-back to the Insurance Industry that perceived payments for policy holders' medical services as a "loss" to their bottom-line profit. Utilization of the term perpetuates toxic semantics, conceptual and policy abuse.

(9) Fail to contest the Medical Provider Defendants' medical deprivations and to assure provision of appropriate and timely medical services to Relator.

**6. Managed Care Organizations Defrauded Relator:**

132. Managed Care Organizations L.A. Care in Los Angeles and S.F. Health Plan in San Francisco exercised callous disregard and refused to advocate for Relator after their contracted medical providers deprived Relator of necessary surgeries—even after the Dept. of Social service' Administrative Law Judge ruled in Relator's favor in 2013 (while he was an enrollee of an MCO and therefore entitled to a hearing) and ordered the shoulder and hip surgeries performed. Their callous disregard of their duties and refusal to help a patient in need of surgeries is reprehensible.

**7. Medical Provider Defendants Defrauded Relator:**

133. They denied Plaintiff-Relator's true diagnosis and foundational disability as well as testing and treatment for it. Their contempt for his disability and his pre-existing medical condition, GdTox/NSF, and his status as an Adaptive Patient in need of a substantial number of medical services including surgeries and treatments, his Medi-Cal coverage, and his persistent grievances for medical deprivations contributed to and further aggravated their contempt for him.

134. Medical Defendants harassed Relator about his disability. Since June 12, 2009, Relator was disabled by GdTx/NSF. Yet, it was not until about 2018—after ten years of demoralizing abuse, deprivation, discrimination, and ridicule—that they began to timidly admit Relator suffers adverse reactions to Bayer's GBCA Magnevist. Yet, they falsely entered in his medical records, "Allergy to Gadolinium," and, "Anaphylactic Shock," not the accurate diagnosis of GdTx/NSF.

135. Medical Provider Defendants accepted and continue to accept State and Federal funds in exchange for contracting with Medi-Cal with the agreement to accept M-C/C-A Enrollees. They also agree to provide appropriate and timely medical services including surgeries to M-C/C-A Enrollees in exchange for those

"Reimbursements," which is an insurance industrial term for payment for services rendered, and supplemental grants.

**a. Medical Providers' Fraudulent Acts:**

(1) Repeatedly perform the same pre-surgical services and bill Medi-Cal for those services, including X-Ray, CT and MR imaging; lab work; specialty evaluations and exams; and testing.

(2) Yet, when the results demonstrate the need for surgery, they falsely deny and manipulate the results to deny Relator the more expensive surgeries and treatments, rendering their original associated pre-op billing fraudulent;

(2) Overtly deprive Relator of appropriate, timely medical service/surgeries;

(3) Covertly enter false information into Relator's electronic medical records;

(4) Covertly create obstacles, delays and denials that discourage M-C enrollees from advocating for appropriate and timely medical services;

(5) Deniy Plaintiff-Relator Patient Affairs intervention and remedial services and refuse to accept his grievances;

(6) Unlawfully exclude Relator and deny him entitled medical services to treat his exacerbated disabilities;

(7) Abuse and misuse medical protocol and findings to deny Relator's need and medical justification for timely medical services including surgeries;

(8) Harass, intimidate, and retaliate against Relator by further denying medical services and defaming him when he filed grievances;

(9) Medically batter and violate Relator by using him as unwitting "lab-rat," upon whom medical students practice their inadequate skills with tragic results of mutilation of Relator. Relator alleges they disproportionately misuse Adaptive persons with disabilities enrolled in Medi-Cal as unwitting "lab-rats," compared to the percentage of enabled and better-insured patients that may be subjected to the same abuse and bill Medi-Cal for their abuse

(10) Physically assault and batter Relator.

**b. Medical Provider Defendants' Medical Deprivations:**

136. For the last thirteen years, Medical Provider Defendants have refused to perform eleven prescribed orthopedic joint surgeries.

137. For the last ten years, Medical Provider Defendants have refused to provide the critical thoracic spinal cord surgery.

138. For the last ten years, Medical Provider Defendants have refused to treat the thoracic disc degradation and perineural (Turlov) cysts.

139. For the last six years, the Medical Providers Defendants refused to surgically treat the iatrogenic mutilation of Relator's cervical spine.

140. For the last three years, the Medical Provider Defendants refused to treat the regressive lumbar disc herniation.

141. For the last seven years, Medical Provider Defendants have refused to surgically replace the defective neuro-stimulator removed in preparation for the thoracic spinal cord surgery (that has not been performed).

142. For the last ten years, Medical Provider Defendants have refused to perform oral surgeries and dental work.

143. Instead, ALL Defendants abandoned Relator. By their cruel design, as per the axial axiom, their refusal to treat his spinal injuries made it impossible for him to receive his orthopedic joint, neuro, and oral surgeries. Consequently, Relator needs but has been denied seventeen prescribed life-sustaining surgeries and twelve treatments that would alleviate, if not eliminate, the majority of his disabilities.

**8. ALL Defendants Collude to Conceal the Deprivations and Fraud:**

144. Together, Public Agency Defendants, Managed Care Organization Defendants and Medical Provider Defendants:

(1) Misrepresent to the federal government, California tax-payers and M-C/C-A enrollees that M-C/C-A complies with state and federal rules and regulations;

(2) Conceal from federal regulators, M-C/C-A enrollees, and citizens the known, significant flaws and non-compliant nature of their M-C/C-A system;

(3) Conceal from federal regulators, M-C/C-A enrollees, and citizens, the significant violations including but not limited to:

(i) Failure to perform oversight;

(ii) Failure to implement, manage, and participate in M-C/C-A, in accordance with applicable federal laws, rules and regulations:

(iii) Misuse of state and federal funds;

(iv) Fraudulent billing;

(v) Unwarranted, fraudulent surgeries upon the most vulnerable patients;

(vi) Effective implementation of the inhumane "Qualys," protocol.

145. ALL Defendants have inverted the "quality of life," medical policy. Ethically, "Quality of Life," requires the timely provision of appropriate medical services to sustain and enhance a patient's quality of life.

146. ALL Defendants inverted it into, "Qualys." This inverted, insidious policy rationalizes depriving, "Disabled," patients of full-equal-fair care. Relator's existing quality of life supposedly dictates a lower priority in triage and entitlement to medical services including surgeries. Relator has been repeatedly told by and Defendants have repeatedly demonstrated by their actions that he is less entitled to appropriate and timely medical services because his is supposedly too low on the "Qualys'" priority analysis as he is, "Disabled," by a terminal iatrogenic GdTox.

147. ALL Defendants have a financial *disincentive* to repair their misuse of M-C/C-A's state and federal funds. Repairs would require the deprivations to be addressed. In the cases of fraud, Defendants would have to refund the misused funds. This would place them at a severe competitive disadvantage in the competitive medical service marketplace. Defendants may face professional termination and ruinous consequences to their careers. Corrective actions would not only lead to the appropriate expulsion of involved state government administrators but expose ALL Defendants to civil and criminal charges.

148. Medical Provider Defendants repeatedly perform, "Presurgical," evaluations, imaging, and tests that demonstrated the medical necessity for the surgeries and bill Medi-Cal accordingly. Yet, they refuse to provide the actual surgery, often citing Medi-Cal's abysmally low reduced reimbursement rate for reason not to perform the surgery, rendering the presurgical billing fraudulent.

149. Public Agency Defendants misuse state and federal funds on non-qualifying programs while ignoring their failures to assure M-C enrollees actually receive appropriate and timely *medical services* including surgeries. For instance, they initiated CalAIM and diverted an overwhelming amount of state and federal funding to "Consulting Fees," to create the program to provide non-medical services without generating a proportional amount of actual service contracts.

150. Through first-hand experience, inquires and research, Relator learned that Medi-Cal's reduced reimbursement rate (RRR) is so abysmally low it is in fact inherently fraudulent. The M-C/C-A enrollment population is so high—14,000,000 enrollees at one point—more than one-third of California's population—California simply does not have sufficient funds to meet the demand of its contractual and ethical duties, so they suppress the reimbursement rate, especially for surgeons, especially for so-called "expensive enrollees.

151. ALL Defendants collude to conceal one another's false claims while profiting from it. Medical Provider Defendants' fraud, false claims, deprivations, discrimination and elder abuse, Public Agency Defendants' failure to oversee them, misuse of funds and abysmally low reduced reimbursement rate, and discrimination, Managed Care Plans' neglect, and their denials of remedial services for medical deprivations render California's M-C/C-A programs, regulatory agencies, managed care plans, contracted medical centers, and physicians noncompliant with relevant state and federal rules and regulations.

152. Defendants provided Relator inferior services, then marginalize, obstruct, and silence him as they escalate their tactics from denying him surgeries

to ignoring his grievances to medical battery to defamation to police brutality, all in the attempt to oppress him as he objects to their abuse and corruption.

153. Their animus for Relator is due to his iatrogenic disabilities and corresponding *substantial* need for medical services, and, after he complained about their deprivations, they retaliated against him. As he has received one hundred procedures, often late, like a death by a hundred cuts, they punish him for requiring what they erroneously perceive to be, "*Excessive*," medical services because they are frantically attempting to conceal their fraud by reducing their costs.

154. Their actions and remarks reveal their belief that he is not entitled to restore his quality of life *at their expense.* They stomp on his rights because they cost *them* too much money. Indeed, they do *cut into* their ill-gotten booty. They contend Adaptive persons with disabilities comprise only 9% of M-C's Enrollment but consume 30% of M-C's budget and therefore must be denied services.

155. The three complicit Defendant groups interfere at each respective level—State Agency—MCO—Medical Providers—to obstruct access to services. Providers deny surgeries without reproach and preclude remedy to avoid costs; MCOs refuse to challenge provider denials as they benefit by avoiding pay-outs, too; Public Agencies deny the aggrieved an ombudsman, case manager or hearings as they benefit by avoiding front *and* back pay-outs, most of all.

156. They thereby deprive Relator at three levels: (1) provision of medical services, (2) accommodation/protection, (3) adjudication. Instead, ALL Defendants perpetuate their self-enriching scheme of symbiotic fraud.

157. They thereby punish Relator for his disabilities and medical condition and deny timely care for his disabilities—iatrogenic disabilities, no less—identifying traits that entitle him to state and federal legal protection, no less.

158. ALL Defendants do not report the injurious deprivations. First, non-disclosure of the incidence of deprivation serves to conceal their original funding deficiency; second, their omissions render standard industrial comparator

instruments such as MCRs misrepresentational to their advantage; third, their omissions preclude accountability and minimize liability.

159. All Defendants deny Relator valid grievance hearings. Thereby, the concealment is complete and what is *kept out of sight, remains out of mind.* To exclude the real story from oversight reports, Defendants render their victims *invisible and voiceless*—a cruel inverted twist of Gertrude Stein's reminiscent, "*There is no there, there.*"

160. Recently, Governor Newson fraudulently proclaimed that he was raising Medi-Cal's reimbursement rate to be within 87% of Medi-Care's reimbursement rate. In fact, he only raised the rates for Primary Care Physicians, psychological counseling, and doula services. The "tag," bill he signed states nothing about the reimbursement rate to surgeons which has been abysmally and fraudulently too low for the past four decades.

161. Recently, Relator consulted a spine surgeon for the two complex spine surgeries. The medical necessity for surgeries was self-evident so the discussion focused on Medi-Cal's horrific RRR for surgeons that has decimated Relator's civil rights and the good intentions of many surgeons who want to treat the needy but cannot afford to do so due to Medi-Cal's abysmally low RRR to surgeons.

162. Consider: One-third of California residents are enrolled in Med-Cal, about 14 million people. Los Angeles Times journalist Jack Dolan has published numerous articles about Medi-Cal Enrollees that were delayed or denied treatment and are dying without medical services. For twelve years at twelve major medical centers, Relator received one hundred procedures but they were delayed on average for five years and in some cases, ten years and twelve years, respectively, with a 30% revision rate.

163. To defeat Relator's opposition, Defendants employ hostile tactics that he has dubbed, REVAD: Reverse Everything-Always Deny to oppress him as he

dares to decry their crimes and their oligopoly of the poor's medical service market under the Affordable Care Act by falsely blaming him of crimes against them.

164. It is a giant con of inversion. They invert the upright, altruistic pyramid of medical welfare designed to uplift the needy, into an upside-down pyramid that bears down on M-C Enrollees pinned under the deadly weight of the State. They invert the *intended* beneficiaries into a state-run, oppressive cartel of *unintended* beneficiaries. They invert victim and offender. They invert the promise of life-care into a vampiric life-deprivation.

165. As long as the State refuses to collect the data, the deprivations and fiscal shortages will remain concealed and Medi-Cal will remain the Nabla of Deprivation unless challenged by cross examination before a jury.

166. Given the nefarious deprivations, discrimination and false claims, it is within reasonable extrapolation to conclude that the degree of fraud is astronomical and in the billions of dollars with millions of Medi-Cal victims.

## B. Relator's Unique Vantage Point:

### 1. Relator's Adaptive-Patient Insight:

167. Relator is a senior Adaptive person with disabilities. He endured ALL Defendants' repeated fraud, medical negligence, battery and abuse and can testify against them when called. Their systemic failures, false claims, practices and policies, discrimination and elder abuse pose a tremendous risk to and indeed severely injured Relator, repeatedly.

168. Because Relator observed the same fraud, repeatedly, not only at one California medical center but at more than twenty major medical centers including four County Hospitals, over a twelve-year period-of-time, Relator is informed and believes, and therefore alleges, that the defects and failures are embedded in California's Medi-Cal and CalAim (M-C/C-A) programs and medical service industry's systemic fraud and it is exercised state wide.

xxx

**2. Relator Struggles to Survive Gadolinium Toxicity:**

**a. Inciting Fraud by Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, the Kaiser Permanente Medical Group:**

169. June 12, 2009, Kaiser Permanente Radiologist administered the contraindicated injection of Gadolinium-based contrast agent (GBCA), Magnevist, manufactured by Bayer Pharma in preparation for an MRI, without proper advisement or testing, and thereby injured Relator. Kaiser then lied about its use of the GBCA Magnevist and instead fraudulently claimed they used an iodine-based dye. Gadolinium's four toxicities—fibrotic, nephrotic, orthopedic, neurologic toxicities—damaged ten of Relator's eleven body systems.

170. Linear GBCA's coating is not protective. It quickly deteriorates within the recipient within six to eight hours. In Relator's case, the toxin was trapped in his body for at least 72 hours.

171. 2009 through 2014, Relator endured Kaiser Permanente's False Claims, misuse of state and federal Medi-Cal funds and violations of the Meaningful Use requirement. He repeatedly suffered their aggressive ability-based discrimination and denial of appropriate and timely care including surgeries.

172. Kaiser refused to perform testing for deposited gadolinium within Relator's body, despite his complex, escalating injuries and symptoms.

173. Once he was enrolled in Medi-Cal, Kaiser Permanente denied Relator multiple medical services including shoulder, hip and revision cervical spine surgeries and L.A. Care refused to advocate for his right to the timely care.

174. In 2014, Kaiser subsequently defeated Relator's legal complaint by its mandatory but corrupt Arbitration program. With the assistance of the Federal Drug Administration's (FDA) fraudulent "Black Box Warning Label," the arbitrator ruled against Relator and rewarded Kaiser and L.A. Care for their abuse.

xxx

**b. Relator Cannot Escape the Gravitational Pull of the GBCA/Gadolinium Foundational Fraud:**

**i. Medical Oppression**

175. From June 2009 to 2018, Medical Provider Defendants fraudulently denied Relator was injured by the GBCA Magnevist and denied the one diagnosis he received for Nephrogenic Systemic Fibrosis (NSF) made by Pharmacologist James Adam, MD, in February 2013. The Kaiser arbitrator fraudulently ruled against the NSF diagnosis, ruled Kaiser did not poison Relator because he was not at risk of harm as defined by the 2007 FDA-approved "Black Box Warning Label."

176. Yet, December 19, 2017, eight years after Relator was severely injured, the FDA reversed its thirty-year fraudulent position—partially. It advanced its fraud to the nonsensical realm, ignored established and emerging peer-reviewed research. They declared they were wrong for thirty years. Freed Gadolinium indeed breaches the "Blood-Brain Barrier," and deposits in recipients' brain, spine and other organs. Yet, they fraudulently continue to deny, "Any evidence of harm."

177. The FDA feels entitled to silence and erase the survivors fighting for their lives from the poisoning they allowed. Facts: Gadolinium's ionic radius is nearly identical to calcium. $Gd^{3+}$ ~ 0.94-107.8pm, and $Ca^{2+}$ ~ 0.99-114pm. Therefore, free Gadolinium displaces and mimics Calcium in human body systems. Calcium is not only vital to bone growth, it is the vital secondary signaler for many human biological systems. Also, evidence demonstrates $Gd^{3+}$ attacks the power cell of human cells, the mitochondria. Contrary to the FDA's false assertion, these facts demonstrate the harmful effects of deposited Gadolinium on recipient's bodies.

178. As disturbing as the legal and scientific fraud is to any reasonable person, the FDA's fraudulent deflection of patients' medical costs to state/federal Medicaid/Medicare programs—the subsidization of a foreign corporation's guilt—is fundamentally wrong. It is harmful and toxic to this country's economy and values as Gadolinium is to patients.

179. Another vital event in Relator's fight against the foundational fraud denying his contraction of Gadolinium Toxicity concerns recently deceased, well-known entertainer and entrepreneur Mr. Chuck Norris. In 2018, Relator discovered Mr. Norris and his wife, Gena, launched a social media campaign to educate the public on Gena's fight with Gadolinium Toxicity.

180. Relator learned from their disclosures and subsequent investigation:

1. He was not alone, science (proof) was in his favor, GBCAs are indeed poisonous and he had a legal right to sue Bayer under California's Delayed Discovery Law.
2. In 2017, the European Medical Agency banned Bayer's Magnevist from use and, unlike the U.S., the European Radiology College monitored its removal.
3. In 2018, Bayer Pharma removed Magnevist from the United States market after injuring patients for thirty years with their toxic linear GBCA.
4. Yet, when preparing his complaint in 2018/2019, Relator learned that in 2010, the FDA required Bayer to revise its 2007 warning. Yet, it fraudulently buried the key revision pertaining to Relator in small print on page four, instead of posting it on the front "Black Box Warning Label." It warned that Relator and those in his renal class, CKD3, were indeed at risk of injury, just a supposedly lower risk. Because it was published after Relator was injured, and given his extensive medical incapacitation, and his treating physicians denial of his NSF diagnosis, he had no ability/reason to find it until his 2018/2019 research.
5. In 2018, Ms. Rebecca Abergel, PhD, and her team at Lawrence Berkeley National Laboratory, developed a highly effective chelator, **3,4,3-LI(1,2-HOPO)**. Originally designed to remove radioactive actinide contaminants, its effectiveness for gadolinium (Gd) retention was soon recognized, leading to research into its application for MRI contrast agent detoxification. This orally available compound is significantly more effective at removing gadolinium deposits than traditional agents, with the potential to prevent up to 96% of Gadolinium deposition.

6. In 2018, some Medical Providers reversed their fraudulent denials and acknowledged Relator indeed sustained Gadolinium Toxicity (GdTox) and it sequela NSF. Yet, like the FDA, they enforced a more insidious act of fraud: Though they noted NSF in his electronic records, they refused his plea for Gd testing—despite all the samples pulled from his body during surgeries—and treatment. Instead, Medical Providers, especially Radiologists, bullied and laughed at Relator and thereby obstructed his access to Chelation treatment.

181. Therefore, the 2018 medical reversals were fraudulent as physicians left Relator alone to endure GdTox's torturous injuries without care and continue to deny him expensive surgeries and treatments as they escalate their hostility against him to an abhorrent level of abuse, deprivation, and fraud, denying him care for diagnosed injuries because he complained.

**ii. Judicial Oppression:**

182. Hence, December 2019, Relator sued Bayer Pharma for product liability in California's Superior Court.

183. Alas, in 2021, Bayer Pharma removed the case to Federal Court where the 9th District Federal Court violated its own prior ruling and a law crucial to the intricate balance of state and federal power and Relator's product liability case against Bayer. The Erie Doctrine states that for a case remanded from state court, the federal court must enforce the state law to not only discourage forum shopping but to respect the state laws where the injury occurred and liability was established.

184. Prior to Relator's case, in 2021, the 9th Circuit Federal District Court refused removal of another Bayer Magnevist case from California Superior Court and remanded it back. *Ulleseit v. Bayer Corp.,* No. 19-15778 (9th Cir. 2021)

185. California's Delayed Discovery Rule is a common law doctrine developed by courts (e.g., *Norgart v. Upjohn Co.*) and incorporated into specific statutes of limitations, such as CCP §340.5 (medical malpractice) and CCP §340.1 (sexual abuse) and CACI instructions to the jury, "No. 455, Statute of Limitation

and Delayed Discovery." It pauses the deadline for filing a lawsuit until a plaintiff knows or reasonably should know, they have been injured <u>and knows its *cause*</u>.

186. Because (1) the Kaiser Arbitrator rejected the 2013 NSF diagnosis, and ruled Relator was not harmed by Bayer's GBCA Magnivest, (2) the FDA 2007 "Black Box Label Warning," excluded Relator by definition, and (3) 100% of his treating physicians rejected the 2013 NSF rogue diagnosis (until 2018), Relator had no ability to construct a contrarian medical suspicion—contrary to the entire legal and medical industry—until after the 2018 discoveries cited above.

187. Also in 2023, one physician kindly did what no other one would do for Relator. Timothy Crall, MD, of Mammoth Orthopedic Institute performed a pelvic biopsy and had the bone sample tested. Fourteen years after the one 15 cc. injection of Magnevist, the toxic Gadolinium remains trapped in Relator's body to continue its harm. Yet, since, qualified Medi-Cal physicians refuse to prescribe treatment for Relator to extract the toxic Gadolinium as per the above-cited chelation program.

188. Yet, in 2023, the Federal Court violated (1) its own prior ruling denying removal from state court, (2) the critical Erie Doctrine, (3) California's Delayed Discovery law (an issue of law for the jury), (4) Relator's facts, and unlawfully dismissed his case as supposedly late. Sadly, in 2026, the U.S. Supreme Court declined Relator's Petition for Review and thereby terminated his pursuit of justice and forever suspended him in the maligned realm of legal and medical fraud.

**iii. Research Oppression:**

189. In 2012, Sharon Williams of the Lighthouse Project advised the FDA:

190. Gadolinium ($Gd^{3+}$) is a toxic Rare Earth Element (REE) and has no known biological use in the human body; two studies from 2009, 2012. Research using Gadolinium Chloride (free $Gd^{3+}$) provided proof of its toxic effects including five studies from 1961, 1966, 1980, 1984, 1985—prior to FDA approval in 1988—and ten studies from 1996 to 2012. Yet, because of its paramagnetic properties, Bayer convinced the FDA that the Gadolinium ion could be chelated or bound to a

ligand so that this GBCA complex could be used for MRIs and supposedly slide through the human body to the kidneys and excreted before the toxic ion and ligand could separate; three studies 1984, 1984, 1993.

191. In 1984, Carr et al., conducted the initial clinical study of patients. It preceded Bayer's application and FDA approval by four years. It used Gd-DTPA, the first GBCA that became Bayer's Magnevist. Carr warned, "Care should obviously be taken in patients with impaired renal and/or hepatic function where high in vivo concentrations of Gd-DTPA may occur for prolonged periods."

192. Since 1992, dechelation or separation of the ion and ligand due to transmetallation and acid dissociation was confirmed in four animal studies, two in 1992, 1998, 2006. Human in vivo comparative studies confirmed transmetallation occurs in healthy humans; 1996, 2005. The release of Gadolinium from all linear GBCAs in human serum from healthy volunteers, was several orders of magnitude greater than predicted by conditional stability constants; 2008 study.

193. These findings provide strong evidence that patients even with normal renal function can be injured by Gadolinium Toxicity after dechelation occurs.

194. In October 2025, Sharon Williams, et al, published a 43-page survey of more than 300 patients that establishes the harm of deposited toxic Gadolinium from defective GBCAs. (Williams, S., Grimm, H., Ratnam, S., Walsh, C. (2025). *Signs & Symptoms after Gadolinium Administration: A Patient Survey. Report 1: Symptoms Paralleling Early-Phase NSF*. [Online] https://gadoliniumtoxicity.com/research/ourresearch/contrast-mri-2025-patient-survey-report-1/)

195. The authors cited a 2007 FDA report that contradicts the FDA's 2017 claim of, "No evidence of harm." It states Gadolinium has a particularly harmful effect on human's calcium channels, a critical secondary signaler. Calcium channels are specialized protein complexes in cell membranes that act as gateways to regulate the flow of calcium ions ($Ca^{2+}$) into cells, crucial for converting electrical signals into cellular actions like muscle contractions and neurotransmitter release.

196. The 2007 report justified revision of Magnevist's warning label. (U.S. FDA & Blank, M. (2007). *Division of Medical Imaging and Hematology Products, Memorandum to the File, Gadolinium-Based Contrast Agents (GBCAs) and Nephrogenic Systemic Fibrosis (NSF))*.

197. Therefore, had Bayer submitted the pre-1988 studies to the FDA, linear GBCAs may not have been licensed, let alone used in the renally impaired patients like Relator. For 29 years, Radiologists failed to provide Pharmacist consultations to patients prior to administering the GBCA *drugs*. Combined with the FDA's 29-year delayed order requiring medication guides to be given to patients, the foundational fraud led to the poisoning of several unwitting generations.

**iv. State and Federal Political Oppression:**

198. California's Governor Newsom, Public Agencies, House and Senate Representatives, U.S. federal Congressmembers, Senators and Presidents ignored Relator's pleas for help. Left alone to survive on his own, Relator was compelled to ascertain the motives of his opponents' bad will and contempt for him as they denied him agency assistance and life-sustaining surgeries: Concealment of Fraud.

199. In summary: (1) Every time Bayer received payment for its toxic GBCA drug, Magnevist, which they misrepresented to the FDA at the time of licensing and thereafter, it violated the False Claim Act. (2) The iatrogenic injury caused Relator to need an extraordinary number of procedures but medical providers fraudulently misled him, breached their contractual duties, made false entries in their electronic records, denied necessary surgeries and treatments but charged for preliminary services. (3) Even after 2018, physicians repeatedly refused Relator appropriate, timely care as several stated, he, "Costs too much," and they are not sufficiently paid by Medi-Cal's abysmal RRR. (4) Relator learned from the above 1961-1985 reports and 2007-2025 facts that the government knew or should have known Bayer's FDA license was obtained by fraudulent means. (5) Likewise, Relator notified the government of the Medi-Cal abuse. Therefore, they knew or

should have known of Defendants' fraudulent medical and record-keeping protocols, false diagnoses, deprivations, denigration and discrimination—fraudulent derangement syndrome that continues today.

200. Therefore, the ten-years Statute of Limitation applies herein.

**c. Bayer's History of Disregard for Human Life:**

201. In 1943, IG Farben, Bayer's parent company, used slave labor in factories it built in Nazi concentration camps, most notably in the Monowitz concentration camp, known as Auschwitz III of the Auschwitz camp complex in German-occupied Poland. Almost half of IG Farben's 330,000-strong workforce consisted of slave labor or conscripts, including 30,000 Auschwitz prisoners.

202. In 1988, Bayer obtained FDA approval—based upon false research—it concealed negative findings—to market Magnevist in the United States. In 2009, Magnevist poisoned Relator, caused *kidney failure*, disabled him, damaged ten of his eleven body systems and caused him to need extensive care. In 2018, after its drug poisoned Americans for three decades, Bayer removed it from the market but only after the European Medical Agency (EMA) banned it. Contrarily, the FDA failed to protect U.S. patients from the foreign pharmaceutical predator.

203. In the late 1990s, Bayer introduced a statin drug, Baycol (cerivastatin), but after 52 deaths were attributed to it, Bayer discontinued it in 2001. The side effect was rhabdomyolysis, causing *kidney failure*, which occurred with a tenfold greater frequency in patients treated with Baycol in comparison to those prescribed alternate medications of the statin class.

204. In 2007, Bayer's Trasylol (aprotinin), used to control bleeding during major surgery, was withdrawn from the market worldwide when reports of increased mortality emerged; it was later re-introduced in Europe but not in the U.S.

205. In 2018, Bayer purchased Monsanto for $63 billion and continues to make products with the toxic ingredient found in Round-Up, Glyphosate.

### 3. Oppressed for Nearly Seventeen Years, Relator Finally Has Hope When, in Early 2026, President Trump's Administration Initiated Investigations into M-C Fraud:

206. As a result of the Gadolinium Toxicity, Relator has received about a hundred medical procedures, with half that number representing major surgeries and the other half being minor but intrusive procedures and 30% of which are revision procedures. Additionally, Relator has fought for sixteen outstanding surgeries for twelve, ten, six and four years, respectively, all to no avail.

207. The maligned fact of fraud lies in the delays for prescribed surgeries, not counted in weeks or months but years. For Relator, the average delay is five years from prescription to receipt of surgeries.

208. As his needs were so extensive and ALL Defendants forced him to travel so much, he effectively represents one hundred patients at twenty-one major medical centers needing one hundred procedures. This unique scenario provides the means by which he repeatedly experiences the abuse, deflections, deprivations, discrimination, false claims, fraudulent billing, medical battery, surgical mutilation, elder abuse, and retaliation for his grievances as he fights to survive.

#### a. Relator's History of Received Procedures Since He Contracted Gadolinium Toxicity and their Delays:

| Date | Center | Surgery | Date Diagnosed | Delayed |
|---|---|---|---|---|
| **2009** | | | | |
| 06/12/09 | KP | MRI for Tinnitis: Gadolinium | Renal Failure | |
| 06/13/09 | KP | (1) Kidney Stone Extraction | | |
| 09/15/09 | USC | Extraction and Root Canal | | |
| | | | | |
| **2010** | | | | |
| 2010 | KP | (2) Pelvic S/I Fluoro Injections | | |
| | | | | |
| **2011** | | | | |
| 2010-11 | USC | Dental Drilling | | |
| 2011 | KP | Epidurals/CSF Leak | | |
| 07/12/11 | USC | (1) Root Canal | | |

| | | | | |
|---|---|---|---|---|
| 09/22/11 | KP | (1) Left Carpal Tunnel | | 1.75 yrs |
| 12/27/11 | KP | (1) Pelvic S/I Fusion | | 2.25 yrs |
| | | | | |
| **2012** | | | | |
| 03/06/12 | USC | (6) Jaw/Oral (2/4) (R) | Sept 2009 | 2.50 yrs |
| 03/20/12 | KP | (1) Right Corpal Tunnel | Jan 2010 | 2.00 yrs |
| 2012 | KP | (2) S/I RF Ablation (KP) | Sept 2009 | 3.00 yrs |
| 04/20/12 | KP | (1) Brain MVD, prscrbd 4/19/12 | Sept 2009 | |
| 05/21/12 | KP | (2) C-Spine, 2 level ADR | Jan 2010 | 3.50 yrs |
| 07/12/12 | KP | (1) Nerve Ganglion Injection | Sept 2009 | 3.00 yrs |
| 11/15/12 | KP | (1) Left Hip Fluoro Injection | | |
| | | | | |
| **2013** | | | | |
| 01/07/13 | KP | (1) Facial Nerve Injection (R) | Sept 2009 | 3.25 yrs |
| | | | | |
| **2014** | | | | |
| 05/15/14 | UCLA | (2) Neurectomy/Herniorrhaphy (R) | 01/01/10 | 5.50 yrs |
| 06/20/14 | UCSF | (1) Right S/I Pins Explant (R) | 06/01/12 | 2.25 yrs |
| 07/24/14 | UCSD | (1) Brain/MVD (R) | 04/28/12 | 2.25 yrs |
| 09/15/14 | UCSD | (1) Neuro-stim Trail | 04/28/12 | 2.50 yrs |
| 09/30/14 | UCSD | (1) Neuro-stim Implant | 04/28/12 | 2.50 yrs |
| | | | | |
| **2015** | | | | |
| 02/15/15 | UCSF | (2) C-Spine 2 Level Fusion (R)<br>(1) C-Spine Posterior facet fusion | 09/30/12 | 2.50 yrs |
| 04/10/15 | UCSF | (2) S/I Joint Fluoro Injections | 06/20/14 | |
| 05/20/15 | UCSF | (1) Colonoscopy, IBD v Celiac | | |
| 07/10/15 | UCSF | (2) S/I Joint Fluoro Injections (R) | | |
| 08/14/15 | | Prosthesis Bacterial Infection | | |
| 09/10/15 | UCSD | (1) Neuro-Stim Explant (R) | 08/14/15 | |
| 09/30/15 | UCSD | (1) Vocal Cord Augmentation | 12/27/11 | 4.00 yrs |
| 09/30/15 | UCSD | (1) Septoplasty | 12/27/11 | 4.00 yrs |
| 09/30/15 | UCSD | (1) Sinus Poyp Removal | 12/27/11 | 4.00 yrs |
| 10/22/15 | UCSD | (1) Neuro-Stim Implant, 2nd (R) | 04/20/12 | 3.50 yrs |
| 11/20/15 | UCSF | (1) Colonoscopy, IBD v Celiac | | |
| 11/25/15 | UCSF | (2) S/I Joint Fluoro Injections (R) | 06/20/14 | |
| 12/07/15 | UCSD | (1) Sub-cutaneous Stricture | 09/10/15 | |
| | | | | |
| **2016** | | | | |
| 07/26/16 | UCLA | (1) Occipital Nerve Block (R) | 12/01/15 | |
| 10/26/16 | UCLA | (1) Occipital Nerve Block (R) | 12/01/15 | |
| **2017** | | | | |
| 01/11/17 | UCLA | (2) Bilateral Shoulder Arthrograms | | |
| 01/17/17 | UCLA | (3) Bilateral Hip Arthrograms | | |
| 01/30/17 | SCNS | (2) Bilateral Pelvic Fusions (R) | 09/01/09 | 8,25 yrs |